UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————

| | |
|---|---|
| MARIO VICE and VICTORIA SEAMAN, )<br>individually and on behalf of all others similarly situated, )<br>                                                        )<br>                                    Plaintiffs,       )<br>          v.                                          )<br>                                                        )<br>NATIONAL COLLEGIATE STUDENT LOAN          )<br>TRUST 2004-1; NATIONAL COLLEGIATE         )<br>STUDENT LOAN TRUST 2004-2; NATIONAL       )<br>COLLEGIATE STUDENT LOAN TRUST 2005-2;     )<br>NATIONAL COLLEGIATE STUDENT LOAN          )<br>TRUST 2006-1; NATIONAL COLLEGIATE         )<br>STUDENT LOAN TRUST 2006-3; NATIONAL       )<br>COLLEGIATE STUDENT LOAN TRUST 2007-1;     )<br>TRANSWORLD SYSTEMS, INC.,                 )<br>in its own right and as successor to NCO FINANCIAL )<br>SYSTEMS, INC.; EGS FINANCIAL CARE INC.,   )<br>formerly known as NCO FINANCIAL SYSTEMS, INC.;)<br>AMERICAN CORADIUS INTERNATIONAL, LLC;     )<br>EATON GROUP ATTORNEYS, LLC; RODENBURG     )<br>LAW FIRM; DOE COLLECTORS 1-1000; and      )<br>PENNSYLVANIA HIGHER EDUCATION            )<br>ASSISTANCE AGENCY,                        )<br>                                                        )<br>                                    Defendants.       )<br>                                                        ) | No. 23-cv-6287<br><br><br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br><br><br><br><br>**Jury Trial Demanded**<br><br><br><br><br><br>**FILED VIA ECF** |

———————————————————————————

Plaintiffs Mario Vice and Victoria Seaman, individually and on behalf of all others similarly situated, by the undersigned attorneys, alleges as follows for this Class Action Complaint against defendants National Collegiate Student Loan Trust 2004-1 ("Trust 2004-1"), National Collegiate Student Loan Trust 2004-2 ("Trust 2004-2"), National Collegiate Student Loan Trust 2005-2 ("Trust 2005-2"), National Collegiate Student Loan Trust 2006-1 ("Trust 2006-1"), National Collegiate Student Loan Trust 2006-3 ("Trust 2006-3"), and National Collegiate Student Loan Trust 2007-1 ("Trust 2007-1") (together, the "Trust Defendants"); Transworld Systems, Inc. ("Transworld"), in its own right and as successor to NCO Financial Systems, Inc. ("NCO"); EGS

Financial Care Inc. ("EGS"), formerly known as NCO Financial Systems, Inc.; American Coradius International, LLC ("Coradius"); Eaton Group Attorneys, LLC ("Eaton Group"); Rodenburg Law Firm ("Rodenburg"); Doe Collectors 1-1000; and Pennsylvania Higher Education Assistance Agency, also doing business as American Education Services ("PHEAA" or "AES") (collectively, "Defendants").   These allegations are made on information and belief; an investigation and settlement between the Attorney General of the State of New York ("NYAG") and Transworld; an investigation and settlement between the Consumer Financial Protection Bureau ("CFPB") and Transworld; an investigation and settlement between the CFPB and National Collegiate Student Loan Trusts; and pursuant to investigation by Plaintiff's counsel.

## NATURE OF THE CASE

1.      Defendants collect on alleged student loan debt that they do not own or is uncollectable.   Defendants contact individuals by telephone, email, mail, or directly through automated online payment systems[1] (the "collection letters" or "bills") demanding payment on such alleged debt.

2.      Consumers pay because they are unaware that Defendants may not own the alleged debt and could not prove ownership if required to do so, or that the debt is otherwise uncollectable. According to government investigations, the student loans were part of a complex investment strategy on Wall Street in the 2000s that promoted rapid sales of loans in bulk—and poor or nonexistent record-keeping of who owed what to whom.   To date, Defendants' conspiracy has netted them hundreds of millions of dollars in illicit profits.

---

[1]  For payments made by consumers automatically through online payment systems, Defendants had previously contacted and coerced them into providing the credit card or bank account information necessary to set up the periodic online payment.

3.     National Collegiate[2] has no employees and contracts with PHEAA and Transworld to collect debts on its behalf.

4.     PHEAA makes the initial attempts to collect National Collegiate's alleged debts from consumers like Plaintiffs by sending out bills and collection letters, debiting bank accounts, charging credit card accounts, and/or emailing and calling consumers.

5.     When a consumer does not pay PHEAA the demanded amount, the debt-collection is transferred to Transworld for additional collection efforts.  Transworld may itself attempt to collect or it contracts with law firms and collection agencies throughout the country to collect from consumers on National Collegiate's behalf.  These law firms and collection agencies include Rodenburg and Coradius as well as various other firms, referenced herein as Doe Collectors 1-1000 (and whose identities are known to Defendants).

6.     PHEAA, Transworld, and the law firms and collection agencies have access to all documents in National Collegiate's possession.  They know they do not possess chain of title documentation sufficient to prove ownership.

7.     Government investigators have found that National Collegiate and Transworld collect on alleged debts even though the debts are unprovable and uncollectable.  In September 2020, the NYAG penalized Transworld for collecting National Collegiate debt that was unprovable and uncollectable.  *In re Transworld Sys., Inc.*, NYAG Assurance No. 20-061 (the "NYAG Action").

8.     For example, the NYAG found that Transworld had its "Network' of collection firms demand payment from consumers "even though [Defendants] could not or would not sue

---

[2] There are at least fifteen National Collegiate Student Loan Trusts, including the Trust Defendants presently named in this action.  "National Collegiate" as used herein, collectively refers to all of these entities.

because the statute of limitations for suing on the debt had expired." *Id.* ¶ 41. Though the debt was time-barred and thus not collectable, Defendants nevertheless mailed collection letters demanding payment. Often, these collection letters deceptively "offer[ed]" to "settle" nonexistent collection claims. *Id.* ¶¶ 41–43.

9. The NYAG also found that Defendants concealed their lack of proof of ownership of the debt they were collecting on. *See id.* ¶¶ 3–4, 31. This documentation is essential for Defendants to collect on any debts it claims to own, because National Collegiate never lent anyone money. Instead, National Collegiate claims that its Trusts acquired loans post-lending, as secondary assignees. Secondary assignees cannot collect on debt without documentation tracing the chain of ownership all the way back to the original lender. *See id.*

10. Defendants lacked documentation proving ownership because the loans were subject to a complex securitization process in the mid-2000s. At the time, investors on Wall Street were sold stakes in "pools" combining thousands of loans from private lenders. The Trusts failed to keep track of the thousands of loans and investment stakes. Further complicating the situation is the fact that any one of fifteen National Collegiate's Trusts might be the owner of a particular loan. *Id.* ¶¶ 3–4.

11. According to the NYAG, Defendants have extracted money from individuals despite lacking documentation "demonstrat[ing] a link between the loan at issue and the [specific] Trust" that supposedly owns the loan. *Id.* ¶ 31.

12. Similarly, in September 2017, the CFPB penalized National Collegiate and Transworld $21.6 million for illegal collection efforts.[3]

---

[3] Proposed Consent Judgment, *Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Trust et al.*, No. 1:17-cv-01323-UNA (D. Del. Sept. 18, 2017) (Dkt. No. 3-1); Consent Order,

13.    The CFPB also found that National Collegiate and Transworld collected from consumers over purported debts that they could not prove were actually owed or were too old to sue over.

14.    Further, National Collegiate insiders have confirmed that Transworld and local collectors overseen by Transworld, acting on National Collegiate's behalf, sued consumers without possessing or reviewing documentation proving loan ownership.[4]

15.    National Collegiate has sued Transworld and various other entities involved in collecting debts allegedly owed on Trust-held loans, in the Delaware Court of Chancery (the "Delaware Action").    The Delaware Action acknowledges the use of false and misleading documents in collections against individuals like Plaintiffs, and blames Transworld and its affiliates for this "wrongdoing[] done in the name of the Trusts."[5]

16.    Where individuals do not pay in response to Defendants' collection efforts, Defendants file debt collection lawsuits against them in state court.    These suits defraud individuals and state courts by falsely representing there is documentation proving National Collegiate's ownership of specific loans.    *See* Delaware Action Am. Compl., ¶ 5; *see also* NYAG Action at ¶¶ 19–22, 31.[6]

---

*In re Transworld Sys., Inc.*, Admin. Proc. No. 2017-CFPB-0018 (Consumer Fin. Prot. Bureau Sept. 18, 2017).

[4]  As Paperwork Goes Missing, Private Student Loan Debts May Be Wiped Away, N.Y. Times, July 17, 2017, https://nyti.ms/2vvroKs (quoting Donald Uderitz of Vantage Capital Group) ("It's fraud to try to collect on loans that you don't own," Mr. Uderitz said. "We want no part of that[.]"); Behind the Lucrative Assembly Line of Student Debt Lawsuits, N.Y. Times, Nov. 13, 2017, https://nyti.ms/2jlqMpZ (noting Vantage Capital's approval of the CFPB action against National Collegiate).

[5]  Am. Compl. ¶ 5, *Nat'l Collegiate Master Student Loan Trust I et al. v. U.S. Bank Nat'l Assoc. et al.*, No. 2018-0167 (Del. Ch. June 15, 2018).

[6]  Individuals who were sued in state-court collection suits wherein a Trust was the plaintiff, are excluded from the Class proposed in this Class Action Complaint.

17.     Defendants conspired, among themselves individually and together as a group, to take money from individuals whom Defendants accused of old student loan debts without any intent or ability to prove they owned these debts, had evidence of collectability, or could collect legally given the age of the alleged debt.  This conspiracy to defraud was national in scope, involving agents, and harming individuals, in most if not all states.

18.     This Complaint is on behalf of all those people who paid money in response to Defendants' bills and collection letters, were subject to negative credit reporting by Defendants, or incurred expenses disputing Defendants' collections, but who were not sued in state court.

## JURISDICTION AND VENUE

19.     Defendants conduct business in the State of New York, and Defendants' fraud upon Plaintiffs was coordinated in this District.  Venue is proper in this District.

20.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 & 1337, and under 15 U.S.C. § 1692k(d) and 18 U.S.C. §§ 1964 & 1965.

21.     This Court has jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

22.     This Court also has jurisdiction over all the claims under 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005 ("CAFA"), in that "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant."

## PARTIES

### Plaintiffs

23.     Plaintiff Mario Vice resides in Louisiana.  Plaintiff Vice is a consumer as that term is defined by 15 U.S.C. § 1692a(3).  Defendants corresponded with Plaintiff Vice for the purpose of collecting money from Plaintiff Vice over a consumer debt at issue here.

24.     Plaintiff Victoria Seaman resides in South Dakota.  Plaintiff Seaman is a consumer as that term is defined by 15 U.S.C. § 1692a(3).  Defendants corresponded with Plaintiff Seaman for the purpose of collecting money from Plaintiff Seaman over a consumer debt at issue here.

### Defendants

25.     Defendant National Collegiate Student Loan Trust 2004-1 is a Delaware statutory trust that does business in New York.  Its trustee and agent for service of process is Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19801.  According to U.S. Securities and Exchange Commission filings, National Collegiate Student Loan Trust 2004-1 holds 50,160 loans made to consumers, with principal amounts thereupon totaling $503,446,069.[7]

26.     Defendant National Collegiate Student Loan Trust 2004-2 is a Delaware statutory trust that does business in New York.  Its trustee and agent for service of process is Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19801.  According to U.S. Securities and Exchange Commission filings, National Collegiate Student Loan Trust 2004-

---

[7] *See* Prospectus Supplement, National Collegiate Student Loan Trust 2004-1 (June 7, 2004), https://www.sec.gov/Archives/edgar/data/1290641/000112528204002632/b332019_424b5.txt.

2 holds 49,740 loans made to consumers, with principal amounts thereupon totaling $593,997,243.[8]

27.     Defendant National Collegiate Student Loan Trust 2005-2 is a Delaware statutory trust that does business in New York.  Its trustee and agent for service of process is Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19801.  According to U.S. Securities and Exchange Commission filings, National Collegiate Student Loan Trust 2005-2 holds 29,526 loans made to consumers, with principal amounts thereupon totaling $305,911,953.[9]

28.     Defendant National Collegiate Student Loan Trust 2006-1 is a Delaware statutory trust that does business in New York.  Its trustee and agent for service of process is Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19801.  According to U.S. Securities and Exchange Commission filings, National Collegiate Student Loan Trust 2006-1 holds 46,320 loans made to consumers, with principal amounts thereupon totaling $513,068,490.[10]

29.     Defendant National Collegiate Student Loan Trust 2006-3 is a Delaware statutory trust that does business in New York.  Its trustee and agent for service of process is Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19801.  According to U.S. Securities and Exchange Commission filings, National Collegiate Student Loan Trust 2006-

---

[8]  *See* Prospectus Supplement, National Collegiate Student Loan Trust 2004-2 (Oct. 26, 2004), https://www.sec.gov/Archives/edgar/data/1305287/000112528204004956/b401322_424b2.txt.

[9]  *See* Prospectus Supplement, National Collegiate Student Loan Trust 200-2 (June 7, 2005), https://www.sec.gov/Archives/edgar/data/1327893/000095011605002101/b406868_424b5.txt.

[10]  *See* Prospectus Supplement, National Collegiate Student Loan Trust 2006-1 (Mar. 7, 2006), https://www.sec.gov/Archives/edgar/data/1352760/000095011606000714/b412004_424b5.txt.

3 holds 104,658 loans made to consumers, with principal amounts thereupon totaling $1,353,901,838.[11]

30.     Defendant National Collegiate Student Loan Trust 2007-1 is a Delaware statutory trust that does business in New York.  Its trustee and agent for service of process is Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19801.  According to U.S. Securities and Exchange Commission filings, National Collegiate Student Loan Trust 2007-1 holds 64,781 loans made to consumers, with principal amounts thereupon totaling $721,595,527.[12]

31.     Defendant Transworld Systems, Inc. is a California corporation that maintains principal place of business at 500 Virginia Drive, Suite 514, Ft. Washington, Pennsylvania 19034, and also maintains offices in various other states including Georgia.  Transworld does business throughout the country, including in New York and California, and regularly attempts to collect debts alleged to be due to another.  Transworld is, either directly or indirectly, owned by Platinum Equity, LLC.  Until on or about November 3, 2014, Transworld was owned by Expert Global Solutions, Inc.  Transworld is the successor to Defendant NCO Financial Systems, Inc. Transworld has collected money over student loans purportedly owned by National Collegiate, performing pre-lawsuit and lawsuit-based collection efforts.

32.     Defendant NCO Financial Systems, Inc., presently doing business as EGS Financial Care, Inc., is a Pennsylvania corporation that maintains offices at 50 Prudential Road, PO Box 100, Horsham, Pennsylvania 19044.  NCO does business throughout the country,

---

[11] *See* Prospectus Supplement, National Collegiate Student Loan Trust 2006-3 (Sept. 26, 2006), https://www.sec.gov/Archives/edgar/data/1374067/000112528206005971/b414977_424b5.txt.

[12] *See* Prospectus Supplement, National Collegiate Student Loan Trust 2007-1 (Mar. 7, 2007), https://www.sec.gov/Archives/edgar/data/1389749/000089968107000201/national-424b5_030207.htm.

including in New York, and regularly attempts to collect debts alleged to be due to another.  NCO has collected money over student loans purportedly owned by National Collegiate, performing pre-lawsuit and lawsuit-based collection efforts.

33.     Defendant Eaton Group Attorneys, LLC is a law firm, located at PO Box 3001, Baton Rouge, Louisiana 70821.  Eaton Group does business in Louisiana, and regularly attempts to collect debts alleged to be due to another.  Eaton Group has been retained to collect on consumer debt that National Collegiate claims to own.

34.     Defendant Rodenburg Law Firm is a law firm, located at 300 NP Ave, Ste. 105, PO Box 2427, Fargo, North Dakota 58108.  Rodenburg does business in North Dakota, Minnesota, Montana, South Dakota and Wyoming, and regularly attempts to collect debts alleged to be due to another.  Rodenburg has been retained to collect on consumer debt that National Collegiate claims to own.

35.     Defendant American Coradius International, LLC, is a New York corporation that maintains offices at 2420 Sweet Home Rd. Ste. 150, Buffalo, New York 14228.  Coradius does business throughout the country, including in New York, and regularly attempts to collect debts alleged to be due to another.  Coradius has been retained to collect on consumer debt that National Collegiate claims to own.

36.     Defendants Doe Collectors 1–10000, are debt collection agents and agencies, some attorneys and law firms, that, like Rodenburg and Coradius, each engaged in an independent conspiracy with National Collegiate and other agents of National Collegiate, including Transworld, to collect on consumer debt that National Collegiate claims to own.  They do business throughout the country, including in New York.

37.     Defendant Pennsylvania Higher Education Assistance Agency ("PHEAA"), also doing business as American Education Services (or "AES"), is on information and belief a public corporation, organized under the laws of the Commonwealth of Pennsylvania.  PHEAA maintains offices at 1200 N. Seventh St., Harrisburg, Pennsylvania 17102, and does business throughout the country, including in New York, and regularly attempts to collect debts alleged to be due to another.  PHEAA has been retained by National Collegiate to collect on consumer debt that National Collegiate claims to own.  PHEAA has collected money on most student loans purportedly owned by National Collegiate early in National Collegiate's collections process before such loan accounts are transferred to NCO and/or Transworld for pre-lawsuit and lawsuit-based collection efforts.

## CLASS ALLEGATIONS

38.     This action is brought on behalf of Plaintiffs individually and as a class action on behalf of the following classes, one for each Trust Defendant herein (together the "Class"):

*Trust 2004-1 class*
(a) all persons with whom Defendants communicated, directly or indirectly, for the purpose of collecting consumer debt alleged to be owed to National Collegiate Student Loan Trust 2004-1, (b) from November 1, 2012 through the date of the filing of this action.  Excluded from the Class are the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest, at all relevant times. Also excluded from the Class are Individuals who were sued in state-court collection suits wherein Trust 2004-1 was the plaintiff.

*Trust 2004-2 class*
(a) all persons with whom Defendants communicated, directly or indirectly, for the purpose of collecting consumer debt alleged to be owed to National Collegiate Student Loan Trust 2004-2, (b) from November 1, 2012 through the filing of this action.  Excluded from the Class are the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest, at all relevant times.  Also excluded from the Class are Individuals who were sued in state-court

11

collection suits wherein Trust 2004-2 was the plaintiff.

*Trust 2005-2 class*
(a) all persons with whom Defendants communicated, directly or indirectly, for the purpose of collecting consumer debt alleged to be owed to National Collegiate Student Loan Trust 2005-2, (b) from November 1, 2012 through the filing of this action.  Excluded from the Class are the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest, at all relevant times.  Also excluded from the Class are Individuals who were sued in state-court collection suits wherein Trust 2005-2 was the plaintiff.

*Trust 2006-1 class*
(a) all persons with whom Defendants communicated, directly or indirectly, for the purpose of collecting consumer debt alleged to be owed to National Collegiate Student Loan Trust 2006-1, (b) from November 1, 2012 through the filing of this action.  Excluded from the Class are the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest, at all relevant times.  Also excluded from the Class are Individuals who were sued in state-court collection suits wherein Trust 2006-1 was the plaintiff.

*Trust 2006-3 class*
(a) all persons with whom Defendants communicated, directly or indirectly, for the purpose of collecting consumer debt alleged to be owed to National Collegiate Student Loan Trust 2006-3, (b) from November 1, 2012 through the filing of this action.  Excluded from the Class are the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest, at all relevant times.  Also excluded from the Class are Individuals who were sued in state-court collection suits wherein Trust 2006-3 was the plaintiff.

*Trust 2007-1 class*
(a) all persons with whom Defendants communicated, directly or indirectly, for the purpose of collecting consumer debt alleged to be owed to National Collegiate Student Loan Trust 2007-1, (b) from November 1, 2012 through the filing of this action.  Excluded from the Class are the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest, at all relevant times.  Also excluded from the Class are Individuals who were sued in state-court collection suits wherein Trust 2007-1 was the plaintiff.

39.     While the exact number of Class members can only be determined through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class.

40.     Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct, as complained of herein.  Plaintiffs reserve the right to later re-define the Class or define sub-classes of the Class depending on the needs of the case.

41.     There are common questions of law and fact affecting members of the Class, which common questions predominate over questions that might affect individual members.   These questions include, but are not limited to, the following:

a.   Whether Defendants collected from consumers over debts allegedly owed to any of National Collegiate's Trusts without possessing proof of Trust ownership of the alleged debt;

b.   Whether Defendants collected from consumers over debts allegedly owed to any of National Collegiate's Trusts without confirming the existence of, and reviewing, proof of Trust ownership of the alleged debt;

c.   Whether Defendants collected from consumers over debts allegedly owed to any of National Collegiate's Trusts without confirming the existence of, and reviewing, proof that the amount of the alleged debt is correct, including the extent to which the amount reflects interest or charges rather than principal;

d.   Whether Defendants collected from consumers over debts allegedly owed to any of National Collegiate's Trusts where the alleged debt could not be collected lawfully under applicable statutes of limitation;

e.   Whether Defendants collected from consumers over debts allegedly owed to any of National Collegiate's Trusts without confirming if the alleged debt could be collected lawfully under applicable statutes of limitation;

f.   Whether consumers incurred expenses disputing debt collection efforts for alleged debts that could not be proved or collected upon; and,

g.   Whether Plaintiffs and the other members of the Class are entitled to damages, including return of moneys paid, punitive damages, costs, and/or attorneys' fees, for Defendants' acts and conduct as alleged herein, and the proper measure thereof.

42.     Plaintiffs will fairly and adequately represent the other members of the Class. Plaintiffs have no interests that conflict with the interests of other Class members.  Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members might be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

44.     Members of the Class can be identified from records maintained by Defendants and can be notified of the pendency of this action by United States mail using a form of notice customarily used in similar class actions.

## FACTS

### National Collegiate

45.     At $1.3 trillion, the student loan debt load is second only to that of mortgages in terms of size and risk posed to American consumers.  National Collegiate holds approximately $15 billion of this debt, with more than $5 billion of it now classed as in default.[13]

46.     National Collegiate and its agents collect alleged student loan debt that they do not own, cannot prove they own, or are otherwise uncollectable.

47.     National Collegiate and its agents use automated computer systems, including, but not limited to, boilerplate telephone call scripts and robosigned collection letters whose demands for payment are unsupported by actual admissible evidence.

48.     National Collegiate and its agents engage in such tactics, because National

---

[13] *E.g.*, *In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d 116, 131 (Del. Ch. 2020).

Collegiate's constituent Trusts were too removed from any actual loan origination process to guarantee access to documentation evidencing a consumer's indebtedness.

49.     Further, the debts that Defendants claim National Collegiate's Trusts are owed are often so old—even if real—that they cannot be lawfully collected upon.

50.     National Collegiate's constituent Trusts were created between approximately 2001 and 2007 by First Marblehead Corp.  Through subsidiary The National Collegiate Funding LLC, First Marblehead Corp. purchased, in bulk, student loans that had been originated by large lenders. The National Collegiate Funding LLC later sold those loans to one of the Trusts.  Each Trust then issued asset-backed securities.

51.     As National Collegiate's Trusts have no employees, all acts performed nominally by a Trust, or on its behalf, are actually done by servicing agents or attorneys hired by these servicing agents.

52.     The servicing agents began debt collection activities against consumers once their loans were determined to be in default.  They also accepted payments made by consumers in response to these collection efforts, and oversaw custody of the resulting moneys.

**PHEAA**

53.     PHEAA is National Collegiate's initial servicer, i.e., collecting alleged debts after student loans are determined to be in default.  On information and belief, consumers who pay in response to PHEAA's debt collection efforts for National Collegiate do so via automated payment systems overseen by PHEAA.

54.     When PHEAA's collection efforts are unsuccessful, the debt-collection account against that consumer is transferred for additional collection efforts by Transworld (and before Transworld its corporate predecessor NCO).

55.     According to the Delaware Action, PHEAA was subject to an audit demanded by National Collegiate's owners in late 2015, after the owners suspected that PHEAA lacked documentary proof of debts being asserted against consumers.  PHEAA unilaterally terminated the audit after just two days of auditors' work—but in that time the auditors found that PHEAA lacked documentation proving National Collegiate debts over which PHEAA was collecting.  Ultimately, PHEAA admitted it lacked any documents proving National Collegiate's Trusts own any loans over which it has collected.  *See* Delaware Action Am. Compl., ¶¶ 9, 76, 105–107.

**Transworld**

56.     As of 2013, Defendant NCO acted as a servicing agent for National Collegiate.

57.     On or about November 1, 2014, Defendant Transworld became National Collegiate's servicing agent.[14]

58.     The same personnel, practices, and form documents were employed by NCO and Transworld in collecting the National Collegiate debts before and after the changeover from NCO to Transworld.  References to herein to "Transworld" apply to both Transworld and NCO, unless otherwise indicated.

59.     Transworld has maintained a nationwide network of debt-collection law firms and agencies ("Network Firms"), including Rodenburg and Coradius, through which it coordinates and implements collections on National Collegiate's behalf.

60.     Network Firms work on a contingency basis.

61.     Network Firms are not permitted to contact National Collegiate directly, even for the purpose of obtaining requisite proof of a consumer's indebtedness on a student loan, and/or

---

[14]  NCO and Transworld were both owned by Expert Global Solutions, Inc. until November 2014, when Transworld was sold to Platinum Equity.

National Collegiate's entitlement to sue thereupon.

62.     Transworld has graded Network Firms on, among other indices, their volume of money collected for National Collegiate's benefit.

63.     Transworld support staff work with non-attorney support staff at Network Firms to facilitate the mailing of collection letters to consumers like Plaintiff.

64.     This coordination includes the content of correspondence.

65.     Once an account linked to a particular alleged loan is placed with a Network Firm for collection, that Network Firm is required to attempt to contact the individual(s) believed to owe money on the loan, to try to collect before a lawsuit is filed.  If methods of collection such as phone calls and collection letters fail, a Network Firm may file a collection suit, of which there are thousands against consumers in state courts on behalf of National Collegiate's various Trusts.

66.     At no time does the Network Firm verify the ownership or collectability of the alleged debt.

**Eaton Group, Rodenburg, and Coradius**

67.     Eaton Group is a debt collection law firm that represents purported creditors (both original and debt buyers) in written and oral collections against consumers, and in state-court actions against consumers.  It participates in the Network run by Transworld.

68.     Rodenburg is a debt collection law firm that represents purported creditors (both original and debt buyers) in written and oral collections against consumers, and in state-court actions against consumers.  It participates in the Network run by Transworld.

69.     Coradius is a debt collection agency that represents purported creditors (both original and debt buyers) in written and oral collections against consumers.  It participates in the Network run by Transworld.

70.     Eaton Group, Rodenburg, and Coradius, like all Network Firms, each have mailed hundreds, if not thousands, of collection letters to consumers allegedly indebted to a National Collegiate Trust.

71.     These mailings on behalf of National Collegiate were mass-produced by non-lawyers at the push of a button, and then signed by individuals who had done nothing to confirm the validity of the debt asserted against consumers, including Plaintiff.  In

72.     Eaton Group, Rodenburg, and Coradius, like all Network Firms, did not possess, and did not review, any actual documentary support for the collection efforts pursued against any plaintiff or other consumer on any Trust Defendant's behalf.

73.     Network Firms' debt-collection activities, including against Plaintiffs, are dependent upon: (1) a computer system used to communicate with clients like National Collegiate and Transworld, to automatically generate collection letters for mailing and/or court filings for actions against consumers like Plaintiffs; (2) a computer system used to communicate with the credit reporting bureaus on behalf of National Collegiate and Transworld, to automatically generate notifications to the bureaus of negative information against consumers like Plaintiffs and (3) a non-attorney support staff that far outnumbers attorneys, if any are employed there.

74.     Like any mailing on behalf of National Collegiate, those mailed to Plaintiffs were automatically generated based on a preexisting template.  These are identical, save for the dates and the few pieces of information that have been auto-populated into the template using the electronic data provided by Transworld concerning the individual consumer.

**Defendants Target Plaintiffs**

***Plaintiff Mario Vice***

75.     Between approximately April 17 and May 18 of 2023, Eaton Group mailed or

caused to be mailed five (5) letters to Plaintiff Vice, demanding payment of money on debts allegedly owed to Trusts 2004-2, 2005-2, 2006-1, and 2006-3.  The letters alleged that Plaintiff Vice had paid in the past but that thousands of dollars were still owed.

76.     On or about April 17, 2023, Eaton Group mailed or caused to be mailed a letter to Plaintiff, demanding payment of money on debt allegedly owed to Trust 2004-2.  The collection letter from Eaton Group concerning Trust 2004-2 accused Plaintiff of having had a "Student Loan Note from Jpmorgan [sic] Chase Bank with account number [*********]-001-PHEA." [15]  This letter asserted that Plaintiff Vice owed Trust 2004-2 $9,540.32.

77.     On or about April 17, 2023, Eaton Group mailed or caused to be mailed a letter to Plaintiff, demanding payment of money on debt allegedly owed to Trust 2006-1.  The collection letter from Eaton Group concerning Trust 2006-1 accused Plaintiff Vice of having had a "Student Loan Note from Jpmorgan [sic] Chase Bank with account number [*********]-003-PHEA."  This letter asserted that Plaintiff owed Trust 2006-1 $16,223.29.

78.     On or about April 17, 2023, Eaton Group mailed or caused to be mailed a second letter to Plaintiff Vice concerning Trust 2006-1, and also demanding payment of money on debt allegedly owed to Trust 2006-1.  This second collection letter from Eaton Group concerning Trust 2006-1 accused Plaintiff Vice of having had a "Student Loan Note from Jpmorgan [sic] Chase Bank with account number [*********]-004-PHEA."  This second letter concerning Trust 2006-1 asserted that Plaintiff owed Trust 2006-1 $32,396.45.

79.     On or about April 27, 2023, Eaton Group mailed or caused to be mailed a letter to Plaintiff, demanding payment of money on debt allegedly owed to Trust 2006-3.  The collection

---

[15]   The accounts numbers listed in the collection letters discussed herein have been partially redacted with brackets and asterisks for privacy reasons.  Notations of "[sic]" have been supplied by Plaintiffs.

letter from Eaton Group concerning Trust 2006-3 accused Plaintiff Vice of having had a "Student Loan Note from Jpmorgan [sic] ChaseBank [sic] with account number [*********]-005-PHEA." This letter asserted that Plaintiff owed Trust 2006-3 $53,622.09.

80.     On or about May 18, 2023, Eaton Group mailed or caused to be mailed a letter to Plaintiff, demanding payment of money on debt allegedly owed to Trust 2005-2.  The collection letter from Eaton Group concerning Trust 2005-2 accused Plaintiff Vice of having had a "Student Loan Note from Jpmorgan [sic] ChaseBank N.A [sic] with account number [*********]-002-PHEA."  This letter asserted that Plaintiff owed Trust 2005-2 $16,471.12.

81.     On information and belief, the collection letters described above were mailed at the direction, express or implied, of Transworld.

82.     On information and belief, each collection letter described above was prepared using a boilerplate template.  The same boilerplate letter was used in hundreds, if not thousands, of collections that Eaton Group pursued on National Collegiate's behalf.

83.     By mailing the collection letters described above, Defendants represented, expressly or by implication, that they possessed proof of indebtedness, including proof that the named Trusts owned the alleged debts in question and that they were collectable.

84.     Defendants, however, did not possess such proof.

85.     Further, collection was barred by the statute of limitations of applicable state law.

86.     Plaintiff Vice took substantial time from his personal and professional life as a result of the collection letters sent by Eaton Group.  Such time spent has included visiting his local courthouse to check the records of local state-court actions to confirm whether Eaton Group's attorneys had filed a state-court action against him in addition to the collection letters; and checking his credit reports to confirm whether or not Eaton Group had caused negative entries to

be made therein regarding the debts allegedly owed to the Trusts.  Further, Plaintiff Vice has written and mailed, via certified mail, responses to the collection letters sent by Eaton Group, disputing the debt assertions, and demanding proof thereof.

87.     On or about June 1, 2023, Eaton Group sent Plaintiff Vice four (4) mailings in response to his dispute letters by Trusts 2004-2, 2006-1 (as to two alleged debts), and 2006-3.[16] Each of these mailings by Eaton Group contained documents that it described as proof of the debts that he allegedly owes to these Trusts.  However, none of these documents was proof of indebtedness.  Among other invalidities, these documents included a single-page document substantively identical to ones that the NYAG found Defendants herein had unlawfully used to falsely represent chain of title tracing from original lender to a specific Trust. *NYAG Action*, ¶¶ 19–23.

88.     In addition, one of the June 1 mailings from Eaton Group to Plaintiff Vice contained documents referencing an alleged debtor who is not Mr. Vice, and describing an alleged debt that had never been asserted against him.

89.     On information and belief, the dispute-response mailings described above were mailed at the direction, express or implied, of Transworld.

90.     On information and belief, each dispute-response mailing described above was prepared using a boilerplate template.  The same template was used in hundreds, if not thousands, of collections that Eaton Group pursued on National Collegiate's behalf.

91.     In addition to harms already described above, Plaintiff Vice suffers mental and emotional anguish and aggravation from, among other things, being repeatedly subjected to rounds

---

[16]  As of the date of this filing, Plaintiff Vice has not yet received a response to the dispute letter concerning the debt assertions as to Trust 2005-2.  On information and belief, this alleged debt suffers the same invalidities described above as to the other alleged Trust debts.

of collection attempts by different sets of Defendants' collection agents, with new ones contacting him even after others disavowed the right to collect from him.   For example, Plaintiff Vice previously received a series of communications from National Collegiate's agents in approximately 2017; in response Plaintiff spent roughly $10,000 to hire an attorney to communicate with National Collegiate's agents on his behalf, after which the collection efforts ceased, thereby representing to Plaintiff Vice by implication that the debts asserted were not collectable.

92.     Plaintiff Vice nevertheless continues to be subjected to Defendants' collection attempts.   Among other continuing harms, he constantly worries about the threat of the debts alleged and their overwhelming amounts and is unable to fully enjoy his non-working time due to the constant worry.

### Plaintiff Victoria Seaman

93.     On or about March 7, 2022, Coradius mailed or caused to be mailed four (4) letters to Plaintiff Seaman, demanding payment of money on debts allegedly owed to Trusts 2004-1, 2004-2, 2006-3, and 2007-1.   The letters alleged that Plaintiff Seaman had paid in the past but that thousands of dollars were still owed.

94.     On information and belief, these mailings were done at the direction, express or implied, of Transworld.

95.     On information and belief, each letter was prepared using a boilerplate template. The same boilerplate letter was used in hundreds, if not thousands, of collections that Coradius pursued on National Collegiate's behalf.

96.     The collection letter from Coradius concerning Trust 2004-1 accused Plaintiff Seaman of having "had a NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1 account

from BANK OF AMERICA with account number [*********]-001-PHEA." This letter asserted that Plaintiff owed Trust 2004-1 $9,748.12.

97.     The collection letter from Coradius concerning Trust 2004-2 accused Plaintiff Seaman of having "had a NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2 account from BANK OF AMERICA with account number [*********]-002-PHEA." This letter asserted that Plaintiff owed Trust 2004-2 $18,674.08.

98.     The collection letter from Coradius concerning Trust 2006-3 accused Plaintiff Seaman of having "had a NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3 account from BANK OF AMERICA with account number [*********]-004-PHEA." This letter asserted that Plaintiff owed Trust 2006-3 $15,601.66.

99.     The collection letter from Coradius concerning Trust 2007-1 accused Plaintiff Seaman of having "had a NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1 account from BANK OF AMERICA with account number [*********]-005-PHEA." This letter asserted that Plaintiff owe Trust 2006-3 $12,809.33.

100.     By mailing the collection letters described above, Defendants represented, expressly or by implication, that they possessed proof of indebtedness, including proof that the named Trusts owned the alleged debts in question and that they were collectable.

101.     However, on information and belief, Defendants were unable to prove current ownership by the named Trusts of any of the alleged loans.

102.     Further, the attempt to collect any potential debt would be barred by the statute of limitations of any applicable state law.

103.     In the weeks that followed her receipt of Coradius's collection letters, Plaintiff Seaman had several phone calls with employees of Coradius, in which Plaintiff Seaman disputed

Coradius's right to collect anything from her for the Trusts' benefit.

104.    On or about July 31, 2022, Plaintiff received an alert from her credit-monitoring service alerting her that her credit score had been lowered due to new negative credit report entries made against her by Coradius asserting that she owed debts to Trust Defendants.

105.    On information and belief, the transmission of the negative credit report entries was at the direction of Transworld.

106.    On information and belief, the same process of transmitting negative credit report entries was used in hundreds, if not thousands, of collections that Coradius pursued on National Collegiate's behalf.

107.    By transmitting negative credit report entries, Defendants represented, expressly or by implication, that they possessed proof of indebtedness, including proof that the identified Trusts owned the alleged debts in question and that they were collectable.

108.    Defendants, however, did not possess proof of ownership.

109.    Further, collection was barred by the statute of limitations of applicable state law.

110.    After Plaintiff Seaman learned of Defendants' negative credit report entries against her, Plaintiff filed a complaint with the CFPB about them and demanded their removal from all credit reports about her.  By approximately August 4, 2022, the negative credit report entries were removed from her credit history.

111.    In a letter to Plaintiff Seaman dated August 4, 2022, Coradius told Plaintiff that "your account has been closed in our office" and "we have removed our tradeline"—i.e., the negative credit report entries against Plaintiff asserting Trust debt.

112.    On or about September 15, 2022, Rodenburg mailed or caused to be mailed a letter to Plaintiff Seaman, demanding payment of money on debt allegedly owed to Trust 2007-1.  The

collection letter from Rodenburg concerning Trust 2007-1 accused Plaintiff Seaman of having had a Bank of America loan "with account number [*********]-005-PHEA."  This letter asserted that Plaintiff owed Trust 2007-1 $12,809.33.

113.   After receiving this letter, Plaintiff Seaman mailed Rodenburg a dispute letter by regular mail and filed a complaint with the CFPB disputing Rodenburg's right to collect anything from her for the Trust's benefit.

114.   On or about September 22, 2022, Rodenburg mailed or caused to be mailed a letter to Plaintiff, demanding payment of money on debt allegedly owed to Trust 2004-1.  The collection letter from Rodenburg concerning Trust 2004-1 accused Plaintiff of having had a Bank of America loan "with account number [*********]-001-PHEA."  This letter asserted that Plaintiff Seaman owed Trust 2004-1 $9,755.62.

115.   After receiving this letter, Plaintiff mailed Rodenburg a dispute letter by regular mail and filed a complaint with the CFPB disputing Rodenburg's right to collect anything from her from her for the Trust's benefit.

116.   On or about February 1, 2023, Rodenburg mailed or caused to be mailed a letter to Plaintiff Seaman, demanding payment of money on debt allegedly owed to Trust 2004-2.  The collection letter from Rodenburg concerning Trust 2004-2 accused Plaintiff of having had a Bank of America loan "with account number [*********]-002-PHEA."  This letter asserted that Plaintiff Seaman owed Trust 2004-2 $18,674.08.

117.   After receiving this letter, Plaintiff mailed Rodenburg a dispute letter by regular mail disputing Rodenburg's right to collect anything from her for the Trust's benefit.[17]

---

[17]   As of the date of this filing, Plaintiff Seaman has received no documents from Rodenburg in response to any of her dispute letters.  On information and belief, any documents that Defendants

118.   On information and belief, the collection letters described above were mailed at the direction, express or implied, of Transworld.

119.   On information and belief, each collection letter described above was prepared using a boilerplate template.  The same boilerplate letter was used in hundreds, if not thousands, of collections that Rodenburg pursued on National Collegiate's behalf.

120.   By mailing the collection letters described above, Defendants represented, expressly or by implication, that they possessed proof of indebtedness, including proof that the named Trusts owned the alleged debts in question and that they were collectable.

121.   Defendants, however, did not possess such proof.

122.   Further, collection was barred by the statute of limitations of applicable state law.

123.   Plaintiff Seaman took substantial time from her personal and professional life to respond to (1) the collection letters sent by Coradius, (2) the negative credit report entries transmitted by Coradius, and (3) the collection letters sent by Rodenburg.  Such time spent has included communicating disputes with personnel from the CFPB, Coradius, and Rodenburg, both in writing and orally.

124.   Further, Plaintiff Seaman's credit score dropped by approximately fifteen (15) points following Defendants' negative credit report entries described above.  Her credit score and credit history has not fully recovered its prior level since this drop, permanently harming her ability to obtain credit in the future, including for a planned home purchase.  On information and belief, the drop in her credit score was caused by Defendants' negative credit report entries, and her credit reputation would not have suffered permanent damage but for Defendants' negative credit report

---

might possess as to Plaintiff Seaman suffer the same invalidities as described above concerning the documents sent to Plaintiff Vice.

entries.

125.    Plaintiff Seaman also suffers mental and emotional anguish and aggravation from, among other things, being repeatedly subjected to rounds of collection attempts by different sets of Defendants' collection agents, with new ones contacting her even after others disavowed the right to collect from her when she disputed.  Plaintiff Seaman often has difficulty sleeping at night, as she worries if the following day will bring yet another collection attempt by Defendants.

**Defendants' Conspiracy Unravels**

126.    After many years in operation, and countless consumers victimized, a series of recent public events finally shed a spotlight on Defendants' conspiracy.

### *Donald Uderitz Speaks Out*

127.    Donald Uderitz is the founder of Vantage Capital Group, a private equity firm that is the beneficial owner of National Collegiate.  His company keeps whatever money is left after National Collegiate's noteholders are paid off.

128.    Mr. Uderitz granted an interview to the *New York Times* for a July 17, 2017 article about National Collegiate's systematic inability to produce proof of indebtedness and entitlement to sue.[18]

129.    Mr. Uderitz told the *New York Times* that an audit of Transworld which he had paid for revealed that, of a random sample of roughly 400 National Collegiate loans, not one had paperwork evidencing the chain of ownership.

130.    As the *New York Times* article states:

> While Mr. Uderitz wants to collect money from students behind on their bills, he says he wants the lawsuits against borrowers to stop, at least until he can get more information about the documentation that underpins the loans.

---

[18]  *See supra* note 3.

"It's fraud to try to collect on loans that you don't own," Mr. Uderitz said.  "We want no part of that." (emphasis added).

### The CFPB's Findings

131.    Several weeks after Mr. Uderitz's comments to the *New York Times*, the CFPB announced its findings against National Collegiate and Transworld following a years-long investigation.

132.    The CFPB penalized National Collegiate and Transworld for three categories of lawbreaking: (1) filing lawsuits without the intent or ability to prove the claims, if contested; (2) filing lawsuits over time-barred debt; and (3) filing false and misleading affidavits in support of lawsuits against consumers.

133.    As to the first category, filing baseless lawsuits, the CFPB found that, among other things:

> Defendants filed at least 1,214 collections lawsuits against consumers even though the documentation needed to prove they owned the loans was missing.  Through these lawsuits, the Defendants obtained approximately $21,768,807 in judgments against consumers. . . .

> In these lawsuits, documentation of a complete chain of assignment evidencing that the subject loan was transferred to the Defendants was missing. . . .

> In addition, the Defendants filed at least 812 collections lawsuits where the documentation did not support Trusts' ownership of the loans.  The chain of assignment documentation shows that these loans were allegedly transferred to Defendants before they were in fact disbursed to consumers. . . .

> In at least 208 other collections lawsuits, the promissory note to prove that a debt was owed did not exist or cannot be located. . . .

> For each collections lawsuit described [above], Defendants could not prove that a debt was owed to Defendants, if contested. . . .

> Defendants knew, or their processes should have uncovered, that these

chain of assignment documents were missing or flawed, yet Defendants continued to file collections lawsuits.[19]

134.    As to suing over time-barred alleged debts, the CFPB found that:

In at least 486 collections lawsuits, in connection with collecting or attempting to collect debt from consumers, Defendants filed a collections lawsuit outside the applicable statute of limitations.[20]

135.    As to the false and misleading affidavits, the CFPB found that, among other things:

In the[] affidavits, the affiants swore that they had personal knowledge of the education loan records evidencing the debt. . . .

In fact, in numerous instances, affiants lacked personal knowledge of the education loan records evidencing the debt when they executed the affidavits. . . .

The affiants also swore in the affidavits that they were authorized and competent to testify about the consumers' debts through review of and "personal knowledge" of the business records, including electronic data, in their possession. . . .

In fact, in numerous instances, affiants lacked personal knowledge of the business records, including the electronic data, showing that consumers owed debts to the Defendants. . . .

Affiants were instructed to review data on a computer screen to verify information in the affidavits about the debts. Affiants, however, did not know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether those data meant that the debt was in fact owed to Defendants. . . .

Each affiant also swore that he or she had "personal knowledge of the record management practices and procedures of Plaintiff [National Collegiate] and the practices and procedures Plaintiff requires of its loan servicers and other agents." . . .

In fact, affiants lacked personal knowledge of the record management practices and procedures of Defendants and the practices and procedures of Defendants' agents. . . .

---

[19]  Compl. ¶¶ 52–57, *Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Trust et al.*, No. 1:17-cv-01323-UNA (D. Del. Sept. 18, 2017) (Dkt. No. 1).

[20]  *Id.* ¶ 58.

In many affidavits, the affiants also swore, "I have reviewed the chain of title records as business records" regarding the relevant account. . . .

In fact, in numerous instances, affiants did not review the chain of assignment records prior to executing the affidavits.  In some cases, affiants reviewed only "chain of title" records that had been found online.  In fact, at least one of Defendants' Servicers instructed affiants that they did not need to review the chain of assignment records before executing affidavits that represented that the affiant had reviewed those records. . . .

In fact, affiants did not have access to deposit and sale agreements—the last link in the chain of assignment transferring loans into National Collegiate— until May 30, 2014. . . .

In many affidavits, the affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to National Collegiates on dates certain. . . .

In fact, affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loan. . . .

<u>In some instances, when affiants complained to management that they did not have personal knowledge of certain representations made in the affidavits, Defendants' Servicers instructed the affiants to continue signing the affidavits.  In some instances, affiants felt "bullied" by management and followed the instructions for fear of losing their jobs.</u>[21]

136.    Indeed, during a June 2017 deposition in an unrelated state-court action, a Transworld paralegal testified that the affiants review as many as <u>40 loan files</u> on a daily basis.[22]

**The Trusts Admit That Consumers Were Defrauded**

137.    On March 9, 2018, National Collegiate's Trusts commenced the Delaware Action against Transworld and the Trusts' other "servicers" of allegedly defaulted, Trust-owned loans.

138.    The Delaware Action blames Transworld and its co-defendants for so "miserably"

---

[21] *Id.* ¶¶ 27–39 (emphasis added).  The CFPB further found that these affidavits were improperly notarized, because, among other things, the notaries did not witness the affiants signing them.  *Id.* ¶¶ 43–51.

[22] Bradley Luke Dep. Tr. 40:21–41:10, *Nat'l Collegiate Student Loan Trust 2006-3 v. Thurlow*, No. PORDC-CV-15-324 (Me. Super. Ct., Cumberland Cnty.) (June 16, 2017).

performing their duties that "rampant fraud[]" occurred in the state-court collection suits filed on behalf of the Trusts and against consumers like Plaintiff.[23]

139.    Describing this fraud, the Delaware Action adopts and expounds the CFPB's investigative findings.  Specifically, the Delaware Action explains how state-court collection suits were prosecuted against consumers in which:

     a.   Standing to sue could not be proved, because no documentation could be found that established Trust ownership of the loan underlying the alleged debt being sued upon; and

     b.   False and misleading affidavits sworn out by Trust agents were submitted to state courts as proof of Trust entitlement to judgment against consumers.[24]

### The NYAG's Findings

140.    On September 11, 2020, the NYAG Action was issued.  Among other findings, the NYAG found Transworld, working with Network Firms for National Collegiate's benefit, targeted individuals for collection despite lacking documentation "conclusively demonstrat[ing] a link between the loan at issue and the [specific] Trust" that supposedly owns the loan.  *NYAG Action*, ¶ 31.

---

[23]  Delaware Action Am. Compl. ¶¶ 4–5; *see supra* note 8.

[24]  *Id.* ¶¶ 5, 71–104.

## AS AND FOR A FIRST CAUSE OF ACTION

**(Fair Debt Collection Practices Act)**
**(Against Transworld, NCO, EGS, Eaton Group, Rodenburg, Coradius, & Does 1-1000)**

141.   Plaintiffs repeat and reallege each and every paragraph set forth above as though fully set forth herein.

142.   Each Plaintiff is a "consumer," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(3).

143.   Transworld is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

144.   NCO is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

145.   EGS is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

146.   Eaton Group is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

147.   Rodenburg is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

148.   Coradius is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

149.   Each Doe Collector 1-1000 is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

150.   The FDCPA was enacted to stop "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a).

151.    The FDCPA identifies sixteen specific, nonexclusive prohibited debt collection practices, and generally prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt." Among the acts prohibited are: the false representation of "the character, amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A); "[t]he false representation or implication . . . that any communication is from an attorney[,]"15 U.S.C. § 1692e(3); "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken[,]" 15 U.S.C. § 1692e(5); "[c]ommunicating . . . credit information which is known or which should be known to be false[,]" 15 U.S.C. § 1692e(8); and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt[,]" 15 U.S.C. § 1692e(10).

152.    The FDCPA also prohibits debt collectors from "us[ing] unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

153.    Defendants violated the FDCPA by making false and misleading representations, using deceptive means, and engaging in unfair and abusive practices. Defendants' violations include, but are not limited to, the following:

   a.   Initiating debt collections against Plaintiffs and the other members of the Class, as described herein, without the intent or ability to prove the claims of indebtedness, if contested;

   b.   causing Plaintiffs and the other members of the Class, as described herein, to spend money and time responding to Defendants' debt collection communications, though Defendants lacked the intent or ability to prove the claims of indebtedness, if contested; and

   c.   communicating credit information adverse to any Plaintiff or other member of the

class, as described herein where that information is false or should be known to be false.

154.    The acts and practices herein set forth were deceptive, misleading, and fraudulent. Plaintiffs and the Class have been damaged as a result of these violations—including both economic and noneconomic damages—and are entitled to relief as provided for by 15 U.S.C. § 1692k.

## AS AND FOR A SECOND CAUSE OF ACTION

**(N.Y. Gen. Bus. Law § 349)**
**(Against All Defendants)**

155.    Plaintiffs repeat and reallege each and every paragraph set forth above as though fully set forth herein.

156.    Each Plaintiff is a consumer entitled to the protection afforded under Article 22-A of the General Business Law ("GBL"), entitled "Consumer Protection from Deceptive Acts and Practices."

157.    GBL § 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] are hereby declared unlawful."

158.    A GBL § 349 cause of action accrues when consumer-oriented conduct would be deceptive and materially misleading to a reasonable consumer, and causes damages.

159.    Defendants' acts and omissions are directed at consumers and include, but are not limited to:

    a.    falsely representing in collection letters mailed to Plaintiff and the other members of the Class, either expressly or by implication, that the Trust identified as creditor is the current owner of the alleged debt under the law;

      b.     communicating credit information adverse to any Plaintiff or other member of the class—including in connection with collection letters sent to consumers—where that information is false or should be known to be false.

160.    Defendants' nexus in New York is not limited to the facts that a significant number of the consumers from whom it extracts money are New York residents and that Network Firm Coradius is based in New York.  Beyond these facts, Defendants' entire scheme has a nexus in New York in that New York City was the location of the securitizations that caused National Collegiate's creation and inability to maintain documentation of ownership of loans involved in the securitizations.  Defendants are liable to consumers under GBL § 349, whether or not the consumers are located in New York.

161.    The acts and practices herein set forth were deceptive, misleading, and fraudulent. As a result of such practices, Plaintiffs and the other members of the Class were injured, suffered damages—including both economic and noneconomic damages—and are entitled to relief as provided for by GBL § 349(h).

## AS AND FOR A THIRD CAUSE OF ACTION

**(California's Rosenthal Fair Debt Collection Practices Act)**
**(Against Transworld, NCO & EGS)**

162.    Plaintiffs repeat and reallege each and every paragraph set forth above as though fully set forth herein.

163.    California's Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 et seq. (the "Rosenthal Act") makes violations of the FDCPA independently actionable by reference.  *See* Cal. Civ. Code § 1788.17 (incorporating by reference "Sections 1692b to 1692j . . . Title 15 of the United States Code," and deeming violators "subject to the [same] remedies [as] in Section 1692k.").

164.     Defendants asserted that Plaintiffs owe a "consumer debt," as that term is defined by the Rosenthal Act, *see* Cal. Civ. Code § 1788.2(f).

165.     Transworld is a "debt collector," as that term is defined by the Rosenthal Act, *see* Cal. Civ. Code § 1788.2(c).

166.     NCO is a "debt collector," as that term is defined by the Rosenthal Act, *see* Cal. Civ. Code § 1788.2(c).

167.     EGS is a "debt collector," as that term is defined by the Rosenthal Act, *see* Cal. Civ. Code § 1788.2(c).

168.     The Rosenthal Act, through the FDCPA, identifies sixteen specific, nonexclusive prohibited debt collection practices, and generally prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt." Among the acts prohibited are: the false representation of "the character, amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A); "[t]he false representation or implication . . . that any communication is from an attorney[,]"15 U.S.C. § 1692e(3); "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken[,]" 15 U.S.C. § 1692e(5); "[c]ommunicating . . . credit information which is known or which should be known to be false[,]" 15 U.S.C. § 1692e(8); and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt[,]" 15 U.S.C. § 1692e(10).

169.     The Rosenthal Act, through the FDCPA, also prohibits debt collectors from "us[ing] unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

170.     Defendants violated the Rosenthal Act, as well as the FDCPA, by making false and misleading representations, using deceptive means, and engaging in unfair and abusive practices.

Defendants' violations include, but are not limited to, the following:

    a.   Initiating debt collections against Plaintiffs and the other members of the Class, as described herein, without the intent or ability to prove the claims of indebtedness, if contested;

    b.   causing Plaintiffs and the other members of the Class, as described herein, to spend money and time responding to Defendants' debt collection communications, though Defendants lacked the intent or ability to prove the claims of indebtedness, if contested; and

    c.   communicating credit information adverse to any Plaintiff or other member of the class, as described herein where that information is false or should be known to be false.

171.    The acts and practices herein set forth were deceptive, misleading, and fraudulent. Plaintiffs and the Class have been damaged as a result of these violations—including both economic and noneconomic damages—and are entitled to relief as provided for by the Rosenthal Act through 15 U.S.C. § 1692k.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Unjust Enrichment)
### (Against Transworld, NCO, EGS, Eaton Group, Rodenburg, Coradius, & Does 1-1000)

172.    Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

173.    Transworld, NCO, EGS, Eaton, Rodenburg, Coradius, and Doe Collectors 1-1000 derived substantial, unjustified, and exorbitant sums in the form of fees for themselves at the expense of Plaintiffs and the other members of the Class.

174.   As a result of Defendants' misconduct, Defendants have been unjustly enriched at the expense of Plaintiffs and the other members of the Class.

175.   It is against equity and good conscience for Defendants to retain the sums gleaned from the collections they performed for the benefit of National Collegiate's Trusts.

## AS AND FOR A FIFTH CAUSE OF ACTION

**(Racketeer Influenced and Corrupt Organizations Act)**
**18 U.S.C. §§ 1962(c), (d)**
**(Civil Remedies)**
**(Against All Defendants)**

176.   Each Plaintiff is a natural person, and thus is a "person" as that term is defined by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *see* 18 U.S.C. §§ 1961(3), 1964(c).

177.   Each Defendant is a corporate entity, and thus all are "person[s]" as that term is defined by RICO, *see* 18 U.S.C. § 1961(3).

178.   Defendants have defrauded consumers by making false and misleading representations, using deceptive means, and engaging in unfair and abusive practices. Defendants' violations include, but are not limited to, the following:

    a.   falsely representing in collection letters sent to Plaintiffs and the other members of the Class, either expressly or by implication, that the Trust identified as creditor is the current owner of the alleged debt under the law;

    b.   communicating credit information adverse to any Plaintiff or other member of the class—including in connection with collection letters sent to consumers—where that information is false or should be known to be false.

**The Enterprises**

179.     Transworld, PHEAA, and each Trust and each Network Firm are distinct groups of persons, such that:

a.  Transworld, PHEAA, and each Trust and each Network Firm have constituted a series of distinct individual "enterprises"—one enterprise per Trust and per Network Firm—as the term "enterprise" is defined by RICO, *see* 18 U.S.C. § 1961(4), and each Defendant is employed by, in partnership with, or otherwise associated in fact with at least one enterprise.[25]  This series of distinct individual enterprises are collectively referenced as the "Enterprises" and individually as an "Enterprise."

b.  Alternatively, Defendants' Enterprises together constitute a separate and distinct "enterprise" under the law.  Defendants, through their participation in the Enterprises, are "associated in fact" together and so meet the law's definition of "enterprise."   18 U.S.C. § 1961(4).   At all times, the scheme required the coordination and active participation of each Defendant in the Enterprises.

180.     The purpose of each Enterprise is to extract money from Plaintiffs and the other members of the Class on debts that are alleged to be owned by a National Collegiate Trust, but for which ownership is unprovable or collection is otherwise unlawful, such that they create no lawful obligation for payment.

181.     The fundamental goal of each Enterprise is effectuated as follows: (1) Transworld coordinates the Network Firms' activities, and manages the content of collection letters mailed to

---

[25]  For example, Transworld, PHEAA, Trust 2004-1, and the Network Firms (such as Eaton Group, Rodenburg or Coradius), constitute one Enterprise.  Transworld, Trust 2004-2, and the Network Firms constitute another.

consumers on behalf of National Collegiate; (2) each Network Firm communicates the deceptive

letters to members of the Class in order to get them to pay despite legally owing nothing; (3) money

is thus extracted from the Class members by having Class members pay money from their banks,

by means of wire, to the Network Firm or Transworld, for ultimate transfer to the account of the

specific Trust alleged to own the debt; and (4) Transworld and the Network Firm are compensated

according to factors including the volume of the collection and the speed of payment by the

consumer being defrauded.

182.    The relationships between the participants in each Enterprise are longstanding and

ongoing.

183.    The Enterprises have for many years—but, at least since 2013—been engaged in,

and continues to engage in, activities that affect interstate commerce.  The Enterprises, which are

in violation of RICO, has been, and remains, longstanding, and continuous, and open ended.

**Pattern of Racketeering Activity: Mail Fraud, Wire Fraud, and Bank Fraud**

184.    Defendants, individually and collectively, through their participation in the

Enterprises, have engaged, directly or indirectly, in a pattern of racketeering activity, as described

below, in violation of 18 U.S.C. § 1962(c) & (d).

185.    Defendants, acting individually and as participants in the Enterprises, have devised

and perpetuated a scheme to deceive individuals believed to owe money on old student loans, and

to obtain money or property through false or fraudulent pretenses and representations.  This

scheme includes, but is not limited to, the following acts:

     a.   participating in the preparation of deceptive collection letters demanding payment;

     b.   disseminating these letters to members of the Class by use of the mails, including
         electronic mail, with the purpose of fraudulently extracting money from them;

    c.   using the interstate mails and wires to receive their fraudulently obtained gains; and

    d.   committing bank fraud by fraudulently obtaining moneys within the possession of U.S. banks.

186.    Defendants, acting individually and as participants in the Enterprise, have made fraudulent misrepresentations on specific occasions, including the following:

    a.   On or about February 1, 2023, Network Firm Rodenburg, pursuant to Transworld's instructions as a servicer for Trust 2004-2, prepared and caused to be mailed a letter to Plaintiff Seaman, demanding that Plaintiff pay money on a debt alleged to be owed to Trust 2004-2, despite this debt not being provable or collectable under the law;

    b.   On or about September 22, 2022, Network Firm Rodenburg, pursuant to Transworld's instructions as a servicer for Trust 2004-1, prepared and caused to be mailed a letter to Plaintiff Seaman, demanding that Plaintiff pay money on a debt alleged to be owed to Trust 2004-1, despite this debt not being provable or collectable under the law;

    c.   On or about September 15, 2022, Network Firm Rodenburg, pursuant to Transworld's instructions as a servicer for Trust 2007-1, prepared and caused to be mailed a letter to Plaintiff Seaman, demanding that Plaintiff pay money on a debt alleged to be owed to Trust 2007-1, despite this debt not being provable or collectable under the law;

    d.   On or about April 17, 2023, Network Firm Eaton Group, pursuant to Transworld's instructions as a servicer for Trust 2004-2, prepared and caused to be mailed a letter

to Plaintiff Vice, demanding that Plaintiff pay money on a debt alleged to be owed to Trust 2004-2, despite this debt not being provable or collectable under the law;

e.   On or about April 17, 2023, Network Firm Eaton Group, pursuant to Transworld's instructions as a servicer for Trust 2006-1, prepared and caused to be mailed two (2) letters to Plaintiff Vice, demanding that Plaintiff pay money on debts alleged to be owed to Trust 2006-1, despite such debt not being provable or collectable under the law;

f.   On or about April 27, 2023, Network Firm Eaton Group, pursuant to Transworld's instructions as a servicer for Trust 2006-3, prepared and caused to be mailed a letter to Plaintiff Vice, demanding that Plaintiff pay money on a debt alleged to be owed to Trust 2006-3, despite this debt not being provable or collectable under the law.

g.   On or about May 18, 2023, Network Firm Eaton Group, pursuant to Transworld's instructions as a servicer for Trust 2005-2, prepared and caused to be mailed a letter to Plaintiff Vice, demanding that Plaintiff pay money on a debt alleged to be owed to Trust 2005-2, despite this debt not being provable or collectable under the law.

187.   Thus, Defendants, acting individually and as participants in the Enterprise, have used the mails and wires and have caused the mails and wires to be used, or reasonably knew that the mails and wires would be used, in furtherance of the fraudulent scheme as described above, in violation of 18 U.S.C. §§ 1341, 1343.  Namely:

a.   Defendants used the interstate mails or wires to coordinate extracting or attempting to extract moneys from Plaintiffs, including the instruction from Transworld's personnel and systems located in Georgia, to Network Firm Rodenburg located in

North Dakota and to Coradius located in New York and to Eaton Group located in Louisiana, to commence collection efforts concerning Trust Defendants;

b. Defendants used the interstate mails or wires to receive the moneys extracted from Plaintiffs in response to the collection letters;

c. Defendants have used the interstate mails and wires on thousands of other occasions that Plaintiffs cannot identify presently, but that are known to Defendants, to extract moneys from the Class.

188. Defendants have used the mails and wires in connection with every collection that they fraudulently pursued against members of the Class, and each such use has furthered the fraudulent scheme and enabled Defendants to take money and/or property from Plaintiffs and the other members of the Class through misrepresentations and false pretenses.

189. Upon information and belief, Defendants each have specific knowledge that the mails and wires have been, and are being, utilized in furtherance of the overall purpose of executing the fraudulent scheme, and/or that it was reasonably foreseeable that the mails and wires would be so used, because moneys would be transferred between Network Firms and Transworld and each Trust, as well as additional moneys paid by members of the Class. Notably, it would be impossible for a Class member to attempt to make a payment on the unprovable debt they are accused of owing, without themselves and Defendants' using the interstate mails or wires.

190. Further, the Enterprise has engaged in bank fraud in violation of 18 U.S.C. § 1344. Defendants, acting individually and as participants in the Enterprise, have obtained moneys and/or other property under the custody or control of a financial institution by means of misrepresentations and fraudulent pretenses, in furtherance of the scheme as described above, as the moneys used to underlie the old policies were in control of U.S. Banks. Namely, for almost a

decade, Defendants sent collection letters with the knowledge and intent to receive payments of moneys that were in the custody and control of U.S. banks, and receiving and processing those payments from U.S. Banks.

191.    Each of the thousands of uses of the mails and wires, and of instances of improperly obtaining control of moneys and/or other property under the custody or control of financial institutions, that occurred in connection with the fraudulent scheme as described above, spanned a period of at least five years, and constitutes a separate instance of, respectively, mail fraud within the meaning of 18 U.S.C. § 1341, wire fraud within the meaning of 18 U.S.C. § 1343, and bank fraud within the meaning of 18 U.S.C. § 1344, and thus is also a predicate act, which acts, taken together, constitute a "pattern of racketeering activity" for the purposes of 18 U.S.C. §§ 1961(1), 1961(5) & 1962.

192.    The acts of racketeering activity that occurred in connection with the fraudulent scheme as described above took place after the effective date of RICO, 18 U.S.C. § 1961 et seq., and on countless occasions over a substantial time period within ten years of each other. These acts of racketeering are an ongoing part of Defendants' regular way of doing business. The predicate acts have been, and will be, repeated over and over again.

**Relationship of the Pattern of Racketeering Activity to the Enterprises**

193.    As detailed above, the purpose of the Enterprises is to extract money from consumers over debts they are alleged to owe but that are not legally provable or collectable.

194.    The pattern of racketeering activity described above is integral to the fraudulent scheme that Defendants perpetuate. Without engaging in mail and wire fraud, Defendants would be unable to demand payments from their victims. Without engaging in bank fraud,

Defendants would not have received the substantial payments they did, which were in the custody of U.S. banks.

195.    Defendants, individually and as participants in the Enterprises, have each conducted or participated, directly or indirectly, in the conduct of the Enterprises' affairs through the pattern of racketeering activity described above. As such, each Defendant has violated 18 U.S.C. § 1962(c).

196.    In addition, each Defendant has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including through the numerous predicate acts of mail, wire, and bank fraud as described above, and has thus violated 18 U.S.C. § 1962(d).

197.    As a direct and proximate result of the RICO violations described herein, Plaintiff and the other members of the Class have suffered substantial injuries. They have lost money in the form of payments extracted, and also higher costs of obtaining credit due to Defendants' negative reporting against their creditworthiness. These extreme and unjust consequences of Defendants' improper conduct in violation of 18 U.S.C. § 1962(c) & (d) amount to injury to property of Plaintiff and the other members of the Class within the meaning of 18 U.S.C. § 1964.

198.    Defendants' misrepresentations in collection letters caused concrete injury to the property of Plaintiff and the other members of the Class. As a result, the actions of Defendants in violation of 18 U.S.C. § 1962(c) & (d) have caused Plaintiff and the other members of the Class to suffer damage to their property within the meaning of 18 U.S.C. § 1964.

199.    Defendants' conduct has involved, and continues to pose, a threat of long-term criminality, as it is believed to have commenced roughly a decade ago and has continued through to the present. The pattern of racketeering as described above has been directed towards tens, if

not hundreds, of thousands of persons, including Plaintiffs, and this pattern has spanned many years.

200.    For the violations of 18 U.S.C. § 1962 described herein, Plaintiffs and the other members of the Class are entitled to recover compensatory and treble damages in an amount to be determined at trial, as well as attorney's fees, and to a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future.

## TOLLING OF THE STATUTES OF LIMITATIONS

201.    Plaintiffs did not know, and could not have known, that it has been Defendants' policy to mail collection letters demanding payment on debts, without the intent or ability to prove the debts lawfully, if contested, but instead intended to deceive state courts through false and misleading evidence.

202.    On information and belief, throughout the time period relevant to this action, Defendants affirmatively concealed from Plaintiffs and the other members of the Class the fraudulent scheme described herein.  As such, neither Plaintiffs nor the other members of the Class could have discovered, even upon reasonable exercise of diligence, Defendants' fraudulent scheme described herein.

203.    Among other things, the false and misleading statements contained in the collections letters that were sent per Transworld's instructions, and that Network Firms mailed or caused to be mailed on behalf of Trust Defendants to Plaintiffs and the other members of the Class, concealed the existence of Defendants' fraudulent scheme.

204.    Therefore, the running of the applicable statutes of limitations have been suspended, by virtue of the fraudulent concealment doctrine, with respect to any claims under the

law cited above that Plaintiffs and the other members of the Class have as a result of Defendants' fraudulent scheme.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment as follows:

i)  Declaring this Action to be a proper plaintiffs' class action, declaring Plaintiffs to be proper representatives of the Class, and declaring Plaintiffs' Counsel to be class counsel;

ii)  On the First Cause of Action, under the FDCPA, awarding Plaintiffs and the other members of the Class statutory and actual damages as provided by 15 U.S.C. § 1692k;

iii)  On the Second Cause of Action, under New York's Unfair and Deceptive Trade Practices Act, awarding such preliminary injunctive and ancillary relief as might be necessary to avert the likelihood of consumer injury during the pendency of this action; and entering a permanent injunction to prevent future violations of the GBL by Defendants;

iv)  On the Second Cause of Action, under New York's Unfair and Deceptive Trade Practices Act, awarding statutory and actual damages as provided by GBL § 349(h);

v)  On the Third Cause of Action, under the Rosenthal Act, awarding Plaintiffs and the other members of the Class statutory and actual damages as provided by Cal. Civ. Code § 1788.17, *see also* 15 U.S.C. § 1692k;

vi)  On the Fourth Cause of Action, for unjust enrichment, so much damages as equity demands, in an amount to be determined at trial;

vii)    On the Fifth Cause of Action, under RICO, awarding Plaintiffs and the other members of the Class actual damages in an amount to be determined at trial, and treble damages;

viii)   On the Fifth Cause of Action, under RICO, awarding Plaintiffs and the other members of the Class such preliminary injunctive and ancillary relief as might be necessary to avert the likelihood of consumer injury during the pendency of this action; and entering a permanent injunction to prevent future violations by Defendants;

ix)     Awarding Plaintiffs costs and expenses, including reasonable attorneys' fees and expenses; and

x)      Granting such other and further relief as the Court might deem just and proper.

Dated:    New York, New York
          July 20, 2023

Respectfully submitted,

**FRANK LLP**

By:   */s/ Gregory A. Frank*
         Gregory A. Frank (GF0531)
         Marvin L. Frank (MF1436)
         Asher Hawkins (AH2333)
         305 Broadway, Suite 700
         New York, New York 10007
         Tel: (212) 682-1853
         Fax: (212) 682-1892
         info@frankllp.com


         Velvel (Devin) Freedman, Esq.
         FREEDMAN NORMAND
           FRIEDLAND LLP
         1 SE 3rd Ave., Suite 1240
         Miami, Florida 33131
         vel@fnf.law

         Joseph Delich
         Stephen Lagos
         FREEDMAN NORMAND
           FRIEDLAND LLP
         99 Park Avenue, Suite 1910
         New York, New York 10016
         jdelich@fnf.law
         slagos@fnf.law

         Kyle W. Roche
         KYLE ROCHE P.A.
         260 Madison Avenue, 8th Fl.
         New York, NY 10016
         kyle@kyleroche.law
         (T): (917) 909-8766